[Civ. No. 8000.   Third Dist.   Dec. 6, 1951.]

In re Proposed Ascertainment and Establishment of the Standing of the ''SONORA DAILY'' as a newspaper of general circulation. ORVILLE KENNETH PECKHAM, as Publisher, Respondent, v. CALIFORNIA NEWSPAPER PUBLISHERS ASSOCIATION, Appellant.

John A. Bohn for Appellant.

F. Edmund O'Connell for Respondent.

PEEK, J.—This is a statutory proceeding instituted by the petitioner and respondent to have the ''Sonora Daily'' established as a newspaper of general circulation under the provisions of sections 6000-6005 of the Government Code. Although the transcript shows a request by contestant's counsel to file a written protest to the petition we find none in the record. Apparently the cause proceeded to hearing upon the sole issue, which issue is the only question now before this court on appeal, of whether the ''Sonora Daily'' is precluded from qualifying as a newspaper of general circulation within the meaning of the above cited sections by reason of the particular methods used in the production of the paper.

The facts which, except in minor matters, are not in dispute, show petitioner and his wife have been the owners

and publishers of the "Sonora Daily" for more than five years immediately preceding the institution of this proceeding; that during all of that period the mechanical work of producing and publishing the paper has been done at petitioner's location in the city of Sonora, county of Tuolumne; that the paper has been published daily except Sundays for more than one year immediately prior to the filing of said petition; that it is published for general circulation in Tuolumne county, carrying various news items and advertising and that it has a bona fide list of subscribers numbering approximately 1,600. Particularly in regard to the manner of producing and publishing the paper the record shows that for approximately nine and a half months of the preceding year the paper was composed on a typewriter. For the remaining two and a half months of that year's period the paper was composed on a machine called a "varityper," and the use of the typewriter was discontinued. The method of composition as disclosed by the record and briefs of the parties appears to be that the typewritten or varityper copy, together with advertisements which were either photographs or illustrations appearing in other publications or actual advertisements clipped from other publications, were laid out on a large board in the exact manner in which they were to appear in the finished newspaper. Also it appears that if a particular type was to be used, paper or cardboard letters of the kind desired would likewise be pasted in the desired spot on the board. This procedure resulted in what is termed as a "master sheet" and a like sheet is made up for each page. The sheets are then photographed and put through a particular procedure which is known as the "offset" process. The basic principle of the offset process is the transfer of the image to a rubber roller or blanket and from it to the paper. In many respects it is quite similar to the more commonly known mimeograph means of reproduction. From these facts the court found that the "Sonora Daily" was a newspaper of general circulation having a bona fide subscription list and that it had been printed and published in the city of Sonora, Tuolumne County, for more than one year preceding the date of the filing of the petition, and judgment was entered in accordance therewith.

The particular sections pertinent to this proceeding are 6000 of the Government Code, which provides as follows:

" 'Newspaper of general circulation' defined. A 'newspaper of general circulation' is a newspaper published for

the dissemination of local or telegraphic news and intelligence of a general character, which has a bona fide subscription list of paying subscribers, and has been established, printed and published at regular intervals in the State, county, or city where publication, notice by publication, or official advertising is to be given or made for at least one year preceding the date of the publication, notice or advertisement.''

And 6003 of that code which provides:

'' 'Printed' newspapers. [Mechanical work performed during whole of year-period.] For a newspaper to be 'printed', the mechanical work of producing it, that is the work of typesetting and impressing type on paper, shall have been performed during the whole of the one year period. [Monthly average.] If a monthly average of at least 50 per cent of the work of typesetting and a monthly average of at least 50 per cent of the work of impressing type on paper is done in accordance with other provisions of this article, the requirements embodied in 'printed' are met.''

Appellant's attack upon the judgment of the trial court is two-fold; first, that the word ''printed'' as used by the Legislature in sections 6000 and 6003 of the Government Code has a definite and fully understood meaning and is at least limited to reproduction by means of impressing type on paper; second, that the Legislature has, in section 6003 of the Government Code, specifically defined ''printed'' to mean ''the work of typesetting and impressing type on paper.'' In reply thereto respondent argues, in essence, that the Legislature has not so limited the meaning of the word ''printed,'' but rather the word merely refers to the mechanical work of producing a newspaper by any reasonable means.

At the outset it should be noted that the word ''printed'' has a variety of meanings, depending on the context in which it is used. (See 72 C.J.S. p. 845.)

It has been held that a typewritten notice is ''printed'' under a statute requiring the posting of printed notices. (*State* v. *City of Oakland,* 69 Kans. 784 [77 P. 694, 696].) On the other hand it has been held that mimeographing is not ''printing'' within the meaning of an appropriation bill appropriating a sum for the printing of session laws. (*Wiggins* v. *Kerby,* 44 Ariz. 418 [38 P.2d 315, 319].) Suffice it to say at this point that the word ''print'' may be used to describe a large number of distinctive mechanical processes. Perhaps the most suitable definition of the general sense of the verb is that found in Webster's dictionary, ''to strike off an im-

pression or impressions of, from type, or from stereotype, electrotype, or engraved plates, *or the like;*" (italics added).

While appellant calls attention to various statutes which make a distinction between printing and typewriting (Gov. Code, § 11091), printing and mimeographing (Pol. Code, § 3714), printing and other methods of reproduction (Gov. Code, § 29073), we cannot agree that the Legislature's use of the word "printed" in these other instances warrants the conclusion that the sense of the word excludes that means of reproduction by use of an offset press.

The problem then, relates not to the generally understood meaning of the word but rather to whatever more limited meaning the word may have taken on by virtue of its context here.

The case points up the importance of determining the purpose and object sought to be accomplished by the statute and the evil to be prevented as an aid to interpretation of the words of the statute. (*California Drive-In Restaurant Assn.* v. *Clark,* 22 Cal.2d 287 [140 P.2d 657, 147 A.L.R. 1028]; *Rock Creek Water Dist.* v. *County of Calaveras,* 29 Cal.2d 7 [172 P.2d 863].) Whether the word "printed" has the meaning contended for by appellant may well depend, indeed should depend, on whether or not one of the objects of the legislation before us was to regulate and limit the mode of production of publications which seek to qualify as newspapers of general circulation. If the word "printed" as used and defined by the Legislature, does not, standing alone, clearly and unequivocally express the limited meaning ascribed to it by appellant, then we must consider the several code sections as a whole to determine whether such a legislative purpose is present as to give to the particular words that clear meaning.

The legislative history of the statutes in question is of some significance here. (*Estate of Ryan,* 21 Cal.2d 498 [133 P.2d 626].) Section 6000 of the Government Code is based on former section 4460 of the Political Code. In 1903 title V was added to part IV of the Political Code, the new title pertaining to publications (Stats. 1903, p. 478). Section 4459 thereof defined a newspaper of general circulation as follows:

"A newspaper of general circulation is a newspaper published for the dissemination of local or telegraphic news and intelligence of a general character, having a bona fide subscription list of paying subscribers, and which shall have been established, printed, and published, in the state, county, city, city and county, or town, where such publication, notice

of publication, or official advertising, is given or made, for at least one year. A newspaper devoted to the interests, or published for the entertainment of a particular class, profession, trade, calling, race, or denomination, or any number thereof, is not a newspaper of general circulation.''

Section 4459 contained the only definition of newspaper of general circulation, and there were no additional sections at that time defining the terms used therein. It may be readily seen that the Legislature used the word ''printed'' in its generally accepted meaning, and there is nothing to indicate that the statute was intended to specify a particular mode of reproduction.

In 1905 section 4460 was added to the Political Code (Stats. 1905, p. 406-407), replacing the former section 4459, and containing essentially the same language as the former section 4459. No definitions of the terms used therein were added. In 1923, section 4463 was added to the Political Code (Stats. 1923, p. 512), the said section defining the terms ''established,'' ''printed,'' and ''published'' as used in section 4460. The section provided that ''. . . 'printed', . . . shall mean, and be construed to mean, that the mechanical work of producing such a newspaper of general circulation, that is to say, the work of typesetting and impressing types on paper, shall have been performed during the whole of the period as designated and required by said section.'' The section also provided that ''. . . in no case shall the words 'printed' and 'published' be construed as synonyms, but each shall be understood to relate to separate acts or functions, necessary to constitute a newspaper of general circulation.''

The purpose behind the 1923 amendment is to some extent revealed in the cases of *In re McDonald* (1921), 187 Cal. 158 [201 P. 110], and *In re Monrovia Evening Post* (1926), 199 Cal. 263 [248 P. 1017]. In the McDonald case the Supreme Court held that if the physical printing of a newspaper was done in a town other than that in which it was published and circulated such fact did not preclude its qualifying as a newspaper of general circulation within the meaning of section 4460 of the Political Code; this because the word ''printed'' was used in that section in the broad sense of publish. In the Monrovia case, decided after the 1923 amendment, the Supreme Court held that the newspaper in question was not one of general circulation within the city of Monrovia because the mechanical operation of printing was performed in Pasadena. The court stated that section 4463

of the Political Code specifically holds that a newspaper is "printed" in the place where the mechanical work of producing it is performed.

Thus it is seen that prior to 1927 there was no apparent effort on the part of the Legislature to limit or define the means of mechanical reproduction by which a newspaper might be printed. The phrase in section 4463, "that is to say, the work of typesetting and impressing types on paper," appears more to be descriptive of the type of operations included within the term "mechanical work of producing" rather than to limit or narrow the general meaning of the word "printed" so as to include only one particular means of printing.

One other case, *In re Hoyle*, 84 Cal.App. 511 [258 P. 726], considers the requirement that a newspaper of general circulation be printed. There the appellate court held that the use of "boiler plate" was not "typesetting," that is, was not part of the mechanical process which is required to be performed in the place where the newspaper is printed and published, so that a newspaper was not prevented from qualifying as a newspaper of general circulation merely because it used, in the process of making up the newspaper, "boiler plate" which was prepared elsewhere.

Additionally, in 1927 section 4463 of the Political Code was amended further to include the following language (Stats. 1927, p. 485): "If a monthly average of at least fifty per cent of the work of typesetting and a monthly average of at least fifty per cent of the work of impressing types on paper be done in accordance with the other provisions of this title such shall be deemed to meet the requirements embodied in the word 'printed.' "

The object of the 1927 amendment seems clearly to be an attempt to meet the problem raised in the Hoyle case; that is, to permit a certain portion of the mechanical work of producing the newspaper to be done elsewhere without jeopardizing the status of the publication as a newspaper of general circulation. The terms "typesetting" and "impressing types on paper" are again a description of the extent to which this mechanical work may be done elsewhere, rather than a limitation on the mechanical methods that may be employed.

The general object of the statutes pertaining to publication may be stated as that of providing a means of displaying public notices, and one requirement laid down by the Legislature to attain that object is that the newspaper,

in order to qualify as an organ for publication of such notices, have a fixed and permanent abode. (*In re Hoyle, supra.*) While the Legislature might, consistent with the general object thus stated, have required in addition that newspapers be printed by a particular process, having determined that such process afforded a more suitable means of displaying public notices, such a requirement would presumably be stated clearly and unequivocally. The language relied upon by appellant, that is, the definition of "printed" is not so clear and unequivocal in that regard, nor is it inconsistent with the single purpose of requiring the newspaper to have a fixed and permanent abode. Furthermore, it should be noted that counsel have cited no cases nor has our research disclosed any, where either the courts of this state, or those of other jurisdictions having similar statutes dealing with the same subject matter, have suggested a legislative purpose to restrict the mechanical means by which newspapers may be printed in order to qualify as newspapers of general circulation. (See 60 C.J.S. pp. 22-23.)

We conclude that in sections 6000 and 6003 of the Government Code the word "printed" is used in the broader sense heretofore discussed, and that it includes the means of reproduction used by respondent. While there may be substantial objections to the use of a varityper and offset-press as a means of producing a newspaper, whatever those objections may be, the problem is a matter of policy more properly addressed to the Legislature than to this court.

The judgment is affirmed.

Van Dyke, J., and Schottky, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 31, 1952.